**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY A. RADER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:14-0110** |
| | ) | **Judge Sharp** |
| **UPPER CUMBERLAND HUMAN** | ) | |
| **RESOURCE AGENCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an employment discrimination action alleging violations of the Family and Medical

Leave Act ("FMLA"), and the Americans With Disabilities Act, and the Americans with Disabilities

Act Amendment Act (collectively "ADA"). Pending before the Court are cross Motions for

Summary Judgment, specifically, Plaintiff Jeffrey A. Rader's Motion for Partial Summary Judgment

(Docket No. 14) and Defendant Upper Cumberland Human Resource Agency's ("UCHRA's")

Motion for Summary Judgment (Docket No. 19). Both Motions have been fully briefed by the

parties and, for the reasons that follow, Defendant's Motion will be granted with respect to

Plaintiff's ADA claim, and denied with respect to both parties' Motions regarding Plaintiff's FMLA

claim.

### I. Factual Background

In May 2006, Plaintiff was hired as the Assistant Kitchen Manager of the UCHRA Jackson

County Kitchen in Gainesboro, Tennessee. That kitchen is responsible for preparing meals for

delivery to senior citizens and other homebound persons as part of the "Meals on Wheels" program

for numerous counties throughout the Upper Cumberland.

While at work on May 20, 2013, Plaintiff used the restroom and, in doing so, allegedly experienced severe pain and bleeding. He left worked that day and claims that from then, until at least May 30, 2013, he was unable to work.

With regard to leaving work during a shift, Defendant's employee handbook states:

"Time Off During Work Day": All employees are required to be at work during their entire designated work period unless sickness or emergencies should occur. In the event it is necessary for an employee to leave the premises under either of these two circumstances, he or she should first seek permission from their Supervisor, or in that Supervisor's absence, another Supervisor, before leaving the area.

(Docket No. 16-3 at 27).

Before departing work, Plaintiff told Brenda Dill, a co-worker, that he was leaving because he was "sick." His supervisor was the Kitchen Manager Lisa Locke, but she was not at work, having started FMLA leave that day. Plaintiff claims that, in her absence, he placed several calls to Ms. Locke's supervisor, Pamela Redmon, UCHRA Nutrition Project Director, whose office is in Cookeville, Tennessee. Unable to reach her, Plaintiff asserts that he left her several voice mails on her office phone that explained he was ill with blood in his stool, and that he was going to the hospital or health department.

Plaintiff did not go to the hospital or health department after leaving work, nor did he even go directly home. Instead, Plaintiff walked from the kitchen to the Town Diner, which took approximately 20 minutes. At the diner, he had a cup of coffee with his Uncle Jim, who then drove Plaintiff home.

Plaintiff was fired the same day he left work. The stated reasons for the discharge were

insubordination and violation of company rules; specifically, walking off the job.[1]

The decision to discharge Plaintiff was made by Kelly Dishman, the Director of Field Operations, in conjunction with Luke Collins, the Executive Director, Katrina Cubbins, the Human Resources Director, and Ms. Redmon.

Ms. Redmon investigated the circumstances of Plaintiff's absence and spoke with Ms. Dill and Denise Perry, who, along with Plaintiff, were the only employees in the building on May 20, 2013. Ms. Dill stated that Plaintiff told her that he was going home because he was sick. Ms. Redmon relayed Ms. Dill's statement to Mr. Dishman, but neither told Mr. Collins or Ms. Cubbins that Plaintiff said he was going home because he was sick. None of the decision-makers contacted Plaintiff before he was discharged.

Plaintiff asserts that, before he was fired, he had a good work record and his performance evaluations were solid. In fact, in his most recent evaluation in June 2012, his performance was rated as good overall, and his attendance and punctuality were rated as very good to excellent. In contrast, Defendant contends that, while Plaintiff's performance evaluations may have been acceptable, he would come to work intoxicated, and one night, after he had been drinking, Plaintiff called the Executive Director at home, which resulted in a reprimand.

On May 21, 2013, Plaintiff appeared at work at the usual start time. Upon arrival, he called Ms. Redmon and told her that he was either "very ill" (Plaintiff's version), or "sick" (Defendant's version). Plaintiff was told that he was not to be at work until he talked with Ms. Cubbins. The next day Ms. Cubbins informed Plaintiff that he had been discharged, and Plaintiff received a letter

---

[1] On the day in question, the kitchen was already short-handed with Ms. Locke being on FMLA leave. Moreover, that day was "Senior Appreciation Day", which Plaintiff conceded in his deposition is "the biggest day of the year" for the kitchen.

informing him of the discharge a day later.[2]

Plaintiff claims that, on May 21, 2013, he contacted the Jackson County Health Department but was informed that the earliest he could be seen was on May 30, 2013.[3]  At the Health Department, Plaintiff was examined by Margie Stafford, a Nurse Practitioner.  After listening to Plaintiff's complaints, taking his vitals, and conducting a physical examination, Ms. Stafford made an "Assessment" that Plaintiff had "Colitis 558.9."[4]  Plaintiff was given a 7-day prescription for Flagyl, and told to continue on a bland diet.  Although Plaintiff was scheduled for a follow-up appointment on June 18, 2013, he missed that appointment.  He also did not take the prescribed Flagyl until after his second visit on July 11, 2013.[5]

Ms. Stafford also wrote a note that stated: "5-30-13 pt was seen today for illness (which he states present for past 10 days) & will be treated – advised to return to clinic [in] 3 weeks." (Docket No. 18 at 13).  Plaintiff provided that note to Defendant in an effort to get his job back but was unsuccessful.

On November 13, 2013, Ms. Stafford completed a Certification of Health Care Provider in which she diagnosed colitis, and estimated that the period of incapacitation was from "5/20/13 → mid June 2013."  (Docket No. 36 at 9).  She also indicated that Plaintiff's "condition has been

---

[2] Defendant claims a letter was mailed the day of the firing because Plaintiff could not be reached by phone.

[3] Plaintiff points out that there is no hospital in Jackson County, and that he could not afford to go to the hospital emergency room in another county.  This suggestion is somewhat undercut by the fact that he sought treatment at the Cookeville Regional Medical Center Emergency Room on occasions, including on August 13, 2013, just three months after the incident at issue.

[4] The notation "558.9" is apparently a reference to the billing code for colitis.

[5] Plaintiff claims that, due to some mix-up or oversight on behalf of the Health Department, he was not given the drug or a prescription until his second visit.

recurrent" but "is stable now," and that "follow up visits [were] needed." (Id.). Ms. Stafford also wrote that the condition could cause episodic (two times per month) "flare-ups but should be able to work if treated." (Id.). Ms. Stafford completed the form by writing, "diagnosis is limited as pt needs imaging & GI referral to further clarify the underlying condition(s)." (Id.).

Over the next two years, Plaintiff received treatment from the Jackson County Health Department on five occasions for colitis. On Ms. Stafford's recommendation, Plaintiff was evaluated by Dr. Michael Zelig, a gastroenterologist. At the time of the visit, Plaintiff presented the following history:

> He comes in with a two year history of gastrointestinal problems. The pain is a cramping that starts in the epigastrium and goes down to his abdomen into the perianal area. He will feel burning coming out of the rectum, like a acidic feeling. He will have symptoms at least three times a month and they last at least a couple days at a time. Sometimes there is diarrhea associated with this. When this occurs the stool would be a very light color. He has seen blood on occasion. It can be dark. It is not black.

(Docket No. 37 at 6).

Dr. Zelig performed a colonoscopy and esophagogastroduodenoscopy.[6] The colonoscopy showed moderate diverticulosis in the sigmoid colon, internal hemorrhoids in the rectum, and a normal terminal ileum.[7]

Dr. Zelig has submitted an affidavit in which he states he first saw Plaintiff on April 1, 2015, and evaluated him "for his complaints of gastrointestinal problems and his history of complaints

---

[6] In his deposition, Plaintiff testified that he believed the procedures performed by Dr. Zelig were paid for by the legal aid society that represents him in this case.

[7] The parties agree that Plaintiff had not been required to miss work prior to May 20, 2013, due to either colitis or diverticulosis, although Defendant contends that he was also not required to miss work on that day or any day thereafter.

since May 2013, reviewing records from the Jackson County Health Department during the course of his treatment." (Docket No. 24). After summarizing the findings from the colonoscopy, Dr. Zelig opined:

> With respect to the diagnosis of diverticulosis, it is my opinion that colonic diverticula are present in nearly one-half of patients who are over 60 years old; that most individuals who posses colonic diverticular are unaware of them; that, indeed, the usual method of discovery is by chance; that there is no evidence that the diverticular themselves cause any symptoms; and that no specific therapy is required for patients with asymptomatic colonic diverticula. In addition, it is my opinion that diverticular bleeds usually resolve within a few days and no specific therapy is required except close monitoring. The hemorrhoids also are not a serious condition requiring any specific therapy, and may account for blood described in his stool, but which would not, however, actually limit Mr. Rader from any activity. It is my opinion that Mr. Rader's condition, as subjectively described to me by Mr. Rader from May 2013 during the course of my treatment and examination, and as objectively evaluated by me, is not a serious condition that would render Mr. Rader unable to perform the functions of his job, based on the job duties and responsibilities and requirements by Mr. Rader [in] his deposition testimony. It is further my opinion that Mr. Rader's condition, as subjectively described by his and as objectively evaluated by me does not substantially limit Mr. Rader from major life activities.

(Id. at 1-2).[8]

## II. Application of Law

As indicated, the parties have filed Cross-Motions for Summary Judgment.[9] Because the standards governing motions for summary judgment are well known, the Court will not reiterate them here other than to say that "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation."

---

[8] The Court notes that, even though Dr. Zelig effectively states that colonic diverticula is not uncommon for those over 60, the medical records in the file indicate that Plaintiff was born in 1968, and Dr. Zelig's Progress Notes indicate Plaintiff was 46 years old at the time of the examination.

[9] Plaintiff's Motion is one for partial summary judgment in that he seeks judgment only on the issue of liability with respect to his FMLA and ADA claims.

Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009).

## A.  Disability Discrimination Under the ADA

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A plaintiff without direct evidence of disability discrimination can seek to prove his case using circumstantial evidence.

"To make out a *prima facie case* of employment discrimination through indirect evidence under [the ADA], a plaintiff must show that '1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'" Whitfield v. Tennessee, 639 F.3d 253, 258-59 (6th Cir. 2011) (quoting Macy v. Hopkins Cty. Sch. Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007)).  "Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." Talley v. Family Dollar Stores of Ohio, Inc. , 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001).  "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." Id.

In this case, Plaintiff's ADA case fails at the *prima face* stage for at least two independent reasons.  First, he has not shown that he was disabled within the meaning of the Act.  Second, he has not shown that Defendant had reason to know of his alleged disability.

Under the ADA, an individual is disabled if he has:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment . . .

42 U.S.C. § 12102(1). Plaintiff argues that his "colitis and diverticulosis are impairments that substantially limited his ability to work and the major bodily functions of his digestive and bowels systems, and therefore, he suffered from a disability under the ADA." (Docket No. 30 at 21-22). Plaintiff also claims that he has a record of a disability.

In determining whether a person is disabled, the Court must decide first, whether the plaintiff suffered from a mental or physical impairment and second, if the impairment exists, whether it substantially limits a major life activity. Childers v. Hardeman County Bd. of Educ., 2015 WL 225058 (W.D. Tenn.2015) (citing Azzam v. Baptist Healthcare Affiliates, Inc., 855 F. Supp. 2d 653, 658–59 (W.D. Ky.2012)). This is because "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA. Plaintiffs also need to demonstrate that the impairment substantially limits a major life activity." EEOC v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 614 (5th Cir. 2009) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002)).

Inasmuch as EEOC regulations define a physical or mental impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as . . . digestive[,]" 29 C.F.R. § 1630.2(h)(1), Plaintiff, having been diagnosed with colitis and diverticula, has shown that he has a physical impairment. What he has not shown, however, are facts from which a reasonable jury could conclude that his impairment(s) substantially limit a major life activity.

Under the ADA, major life activities include "the operation of a major bodily function,

including . . . digestive [and] bowel functions." 42 U.S.C. § § 12102(2)(B).  The regulations also provide that working is a major life activity.  29 C.F.R. § 1630.2(i)(1)(i).  Further, pursuant to the 2008 Amendments to the Act, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major activity when active."  Id. § 12203(4)(D).

After pointing out that the Amendments state that both the definition of "disability" and the term "substantially limit" should construed in favor of broad coverage, id §§ 12102(4)(A), and noting that the regulations indicate that "substantially limits" is "not meant to be a demanding standard," 29 C.F.R. § 2630.2(j)(1)(i), Plaintiff argues that "his gastrointestinal impairments substantially limited the operation of his digestive and bowel functions because they caused bleeding and pain on May 20, 2013 and caused intermittent incapacity thereafter."  (Docket No. 30 at 21). He further argues:

> The fact that Mr. Rader can use the toilet does not call into question his allegations of episodic flare-ups causing periodically incapacitating pain. Dr. Zelig's objective colonoscopy results show that Mr. Rader has an underlying chronic condition of diverticulosis that is responsible for his episodic gastrointestinal flare-ups that periodically prevent him from working.  The medical records and certification completed by Dr. Stafford of the Jackson County Health Department are further proof that Mr. Rader's condition substantially limits him from major life activities, and from the operation of major bodily functions.

(Id. at 22).

The reference to "incapacitating pain" on May 20, 2013 and "episodic flare-ups" that result in such pain is not supported by specific citation to the record.  What the record does show is that, shortly after supposedly suffering "incapacitating pain," Plaintiff took a 20-minute walk across town to have coffee with his uncle.  He did not seek medical treatment then, nor did he actually visit a healthcare provider for ten days.

Plaintiff overstates Dr. Zelig's "objective colonoscopy results."  They do not show that

"episodic gastrointestinal flare-ups" periodically prevent Plaintiff from working. They just show that Plaintiff had moderate diverticulosis and internal hemorrhoids. In fact, Dr. Zelig has rendered the opinion that neither Plaintiff's diverticulosis nor his hemorrhoids rendered him unable to perform the functions of his job.[10]

Plaintiff's reliance on the forms filled out by Ms. Stafford fare no better. The first, a work note Plaintiff gave Defendant, does not suggest a disability; it merely states that Plaintiff "was seen for illness (which he states present for past 10 days)." The second was a form directed towards whether or not Plaintiff was entitled to FMLA leave and did not address a potential disability. Further, and leaving aside that Ms. Stafford's diagnosis was tentative pending further tests, she estimated a "probable duration of condition" of approximately "one month," never stated that Plaintiff was disabled and, as for working, stated Plaintiff "should be able to work if treated," whatever treatment means.

"An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," 29 C.F.R. § 1630.2(j)(ii), and it is "not sufficient for a plaintiff to identify an impairment and leave the court to infer that it results in substantial limitations to a major life activity." Sanchez v. Vilsack, 695 F.3d 1174, 1178 (10th Cir. 2012). Apart from Plaintiff's claims of occasional "incapacitating pain," he offers nothing from which a jury could conclude that he was substantially limited in any major life activity. See, Scheerer v. Potter, 443 F.3d 916, 920 (7th Cir. 2006) ("Although there can be no doubt that [plaintiff] suffered from pain and significant

---

[10] While Plaintiff objects to Dr. Zelig's use of such terms as "serious condition" and "major life activities" because they have legal meanings under the ADA and FMLA, Dr. Zelig, a treating physician, is certainly competent to render his opinion on Plaintiff's condition(s) and what effect they may have on his daily life activities, including work.

inconvenience from his . . . condition, he does not point to enough evidence in the record to show that he was prevented from performing, or was otherwise severely restricted in, any major life activities.").

The alleged substantial impairment of a major life activity aside, Plaintiff's ADA claim fails because he cannot show that Defendant knew or had reason to know of a supposed disability. After all, blood in the stools on May 20, 2013, apparently was a first for Plaintiff and he had no knowledge of a disability at that time. This is evidenced by the following exchange in his deposition:

> Q. All right, Was Kelly J. Dishman, on May 20th, 2013, aware of any disability that you claimed to have?
>
> A. I don't believe he was aware.
>
> Q. Okay.
>
> A. I wasn't aware.

(Docket No. 22-1 at 42-43). If Plaintiff was not aware of a "disability," it follows that his employer would not, and could not, know of the "disability."

In an effort to salvage his ADA claim, Plaintiff makes the briefest of arguments that he had a "record [of] impairment" for purposes of 42 U.S.C. § 12102(1)(b). He writes: "Mr. Rader's recorded voicemail message to Pamela Redmon concerning his having to leave work due to blood in his stool was such 'a record of' a disabling impairment." (Docket No. 15 at 16). This argument borders on the frivolous, even accepting, as the Court must, that is what Plaintiff told Ms. Redmon.

 "A plaintiff has a 'record of impairment' if he or she 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" Spence v. Donahue, 414 Fed. App'x 561, 570 (6th Cir. 2013) (citing MX Group, Inc. v. City of Covington, 293 F.3d 326, 339 (6th Cir.2002)). By Plaintiff's own admission, there was

no history as of May 20, 2013, and it is more than a bit much to expect that Ms. Redmon should have, or even could have, drawn the conclusion that Plaintiff was suffering from a disabling impairment because, on one occasion, he allegedly saw blood in his stool.  See, Neely v. Benchmark Family Servs., 2016 WL 364774, at *5 (6th Cir. Jan. 26, 2016) (stating that for purposes of the "record of impairment" prong, "some diagnosis must explain the duration or severity of the impairment," and holding that "self-described symptoms to [a] physicians, without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity.").

Summary judgment will be granted in favor of Defendant on Plaintiff's ADA claim.

**B.  FMLA Claims**

The Sixth Circuit "recognizes two distinct theories of wrongdoing under the FMLA." Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007).  "The 'entitlement' or 'interference' theory" makes "it unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights" and "require[s] the employer to restore the employee to the same or an equivalent position upon the employee's return." Id.  "The 'retaliation' or 'discrimination' theory, on the other hand . . . prohibits an employer from discharging or discriminating against an employee for 'opposing any practice made unlawful by' the Act." Id. (internal citations omitted).  Plaintiff brings both types of claims in this case.

Both FMLA interference and FMLA retaliation claims are also analyzed utilizing the burden shifting approach, Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir. 2012) which, of course, first requires Plaintiff to establish a prima facie case. "To establish a prima facie case of FMLA interference, [Plaintiff] must show that '(1) []he was an eligible employee; (2) the defendant was an

employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of h[is] intention to take leave; and (5) the employer denied the employee FMLA benefits to which [h]e was entitled.'" Id. at 761 (quoting Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 556 (6th Cir.2006)). "To establish a prima facie case of FMLA retaliation, [Plaintiff] must show that '(1) []he was engaged in an activity protected by the FMLA; (2) the employer knew that []he was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to h[im]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.'" Id.[11]

As a preliminary matter, Defendant argues that, no matter how couched, Plaintiff's FMLA claims fail because he did not provide sufficient notice. Although this presents a closer question than in many case, the Court find that this cannot be determined as a matter of law based on the fact that have been presented.

"'[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave' – 'nothing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee.'" Miles v. Nashville Elec. Serv., 525 F. App'x 382, 385 (6th Cir. 2013) (quoting Brohm v. JH Props., Inc., 149 F.3d 517, 523 (6th Cir. 1998)). The Sixth Circuit has "explained that 'the critical test' for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave"

_____

[11] In its moving papers, Defendant does not proceed beyond the *prima facie* case, while Plaintiff claims that the stated reason for his discharge was a pretext for discrimination. Having reviewed the record, the Court find that questions of fact exist surrounding whether Plaintiff was discharged for legitimate reasons and therefore focuses the discussion on whether Plaintiff has established a *prima facie* case.

covered by the FMLA.  Id. at 386 (quoting Brenneman v. MedCentral Health Sys., 366 F.3d 412, 421 (6th Cir. 2004)).  "Although the employee need not expressly mention the FMLA, []he must 'give[ ] the employer enough information for the employer to reasonably conclude that an event described in [the] FMLA . . . has occurred.'"  Id. (quoting Hammon v. DHL Airways, Inc., 165 F.3d 441, 451 (6th Cir.1999)).

Defendant is correct that Plaintiff simply telling Ms. Dill he was "sick" is insufficient notice of an FMLA qualifying condition.  See, 29 C.F.R. § 825.503(b) ("Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act").  Defendant is also correct that ordinary illnesses, such as an "upset stomach" do not suggest a serious health condition that requires FMLA leave. 29 C.F.R. § 825.113(c).  But complaints about blood in the stool and a stated intention to go to the hospital or health department is at least suggestive of more than a run-of-the-mill sickness, and an employer's duty to inquire arises "'[o]nce an employee invokes his FMLA rights by alerting his employer to his need for potentially qualifying leave.'"  Miles, 525 Fed. App'x at 386 (quoting Righi v. SMC Corp. of Am., 632 F.3d 404, 409–10 (7th Cir. 2011).  Just as "'an employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA," Gipson v. Vought Aircraft Indus., Inc., 387 F. App'x 548, 557 (6th Cir. 2010)), "[t]he employer who precipitously fires an employee, when the latter claims the benefits of leave under FMLA, bears the risk that the health condition in question later develops into a serious health condition," Clinkscale v. St. Therese of New Hope, 701 F.3d 825, 828 (8th Cir. 2012) (citation omitted).

The next issue is whether Plaintiff had a qualifying condition within the meaning of the FMLA.  To receive FMLA leave, an employee must have a qualifying condition, such as "a serious

health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." Id. § 2611(11).

Plaintiff did not receive inpatient care, so the first question becomes whether he can establish continuing treatment by a health care provider. The FMLA does not define that phrase, but the Department of labor has issued regulations that state a "serious health condition involving continuing treatment" includes:

> () Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
>> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>>
>> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.
>>
>> (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.
>>
>> (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30 day period shall be determined by the health care provider.
>>
>> (5) The term extenuating circumstances in paragraph (a)(1) of this section means circumstances beyond the employee's control that prevent the follow-up visit from occurring as planned by the health

care provider.  Whether a given set of circumstances are extenuating depends on the facts.  For example, extenuating circumstances exist if a health care provider determines that a second in-person visit is needed within the 30 day period, but the health care provider does not have any available appointments during that time period.

*                              *                              *

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

(2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115.

Plaintiff has failed to show that he meets the conditions of subsection (a).  Plaintiff does not meet the requirements of (a)(1) because he did not receive treatment on more than one occasion within the first thirty days of his "incapacity," nor did he secure first treatment within seven days of the "incapacity."   Further, there is no evidence that he was under a regimen of continuing treatment within the meaning of (a)(2), and, even if there was (because Plaintiff was prescribed Flagyl, although he did not take it), he did not seek treatment within the first seven days of "incapacity", which is a requirement of for both (a)(1) and (a)(2).  Rather, the record shows that Plaintiff first received treatment on May 30, ten days after he walked off the job, and did not return for treatment until July 11, even though he had an appointments scheduled for June 18, which would have been within thirty days of his first appointment.  Plaintiff has provided nothing from which this failure could be deemed "beyond [his] control" as required by (a)(5) because, in his deposition, Plaintiff

responded to the question, "[y]ou don't have any idea why you didn't keep that appointment," by saying, "[n]o sir." (Docket No. 22-1 at 42-43).[12]

Section (c), "chronic conditions," presents a much closer question. Plaintiff argues:

> Mr. Rader was incapacitated on May 20, 2013 due to extreme gastric pain and bleeding. His gastrointestinal condition has been diagnosed and treated since May 2013, and therefore, continued over an extended period of time. Mr. Rader has required at least two visits per year for treatment of his condition by the Jackson County Health Department and Dr. Zelig. The incapacity that he suffered from, however, was episodic in nature. He had not previously been required to miss work due to these conditions. Therefore, Mr. Rader was incapacitated by his chronic serious health condition on May 20, 2013, and was entitled to FMLA leave.

(Docket No. 30 at 6).

Plaintiff's argument facially seems to be somewhat of a non-sequitur insofar as it suggests that, because his conditions were treated after May 20, he had a chronic condition as of that date. Some cases at least arguably suggest that a chronic condition cannot be based on prospective treatment, which would effectively defeat Plaintiff's argument. See, Darst v. Interstate Brands Corp., 512 F.3d 903, 911-12 (7th Cir. 2008) ( if an employee neither currently suffers from incapacity due to a chronic condition nor undergoes treatment for the incapacity stemming from his chronic condition, his absence from work is not FMLA qualified"); Bickford v. Life Care Ctr. of Am., No.

---

[12] Apparently realizing the insufficiency of that response, Plaintiff filed a post-deposition affidavit in which he states, "I must have had a serious problem to reschedule my June 18, 2013 appointment. To the best of my memory, I think it was because I could not get a ride to the clinic that day." (Docket No. 36 at 2). This hardly suggests circumstances beyond Plaintiff's control and, even if it did, he cannot use an affidavit to directly contradict prior deposition testimony. See, Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006) (under "sham affidavit rule," court must ignore affidavit that directly contradicts prior deposition testimony).

Plaintiff also devotes several pages of his response brief arguing that the seven-day time limit is invalid because it was not promulgated in accordance with the notice-and-comment requirements of the Administrative Procedures Act, 5 U.S.C. § 533. Even if there was some merit to this argument, Plaintiff has not shown two or more treatments within the first thirty days as required by (a)(1), nor has he shown that he was under a regimen of continuing treatment.

1:07-CV-295, 2009 WL 77455, at *1 (E.D. Tenn. Jan. 8, 2009) ("Plaintiff had not demonstrated a genuine issue of material fact as to whether the absences were due to a serious health condition since a fair-minded jury would not be able to determine Plaintiff was incapacitated for the relevant periods").  On the other hand, "FMLA leave 'includes visits to a doctor when the employee has symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined.'" <u>Dalton v. ManorCare of W. Des Moines IA, LLC</u>, 782 F.3d 955, 961 (8th Cir. 2015); <u>see</u> <u>also</u>, <u>Stekloff v. St. John's Mercy Health Sys.</u>, 218 F.3d 858, 863 (8th Cir. 2000) ("There is no requirement in the statute that an employee be diagnosed with a serious health condition before becoming eligible for FMLA leave. . . . As a matter of common sense, moreover, it seems to us that an employee who falls and breaks a leg while on the job should not be required to attempt to keep working (and be subject to termination for failure to do so or even for failure to perform some tasks up to standard) until a doctor arrives and excuses him or her.").

The Court finds it unnecessary to wade too far into this possible thicket.  A chronic condition under the regulations is defined as a "period of incapacity <u>or</u> treatment for such incapacity" for a condition that may be episodic and that continues for an extended period of time, requiring periodic visits to a health care provider.  Ms. Stafford's FMLA certification provides at least a jury question on whether Plaintiff's condition is chronic because she states he was incapacitated as of the day he allegedly fell ill at work and for a period thereafter, he required follow-up visits (which turned out to be more than twice a year), and his condition was episodic.  Moreover, the Court cannot simply ignore the fact that even Dr. Zelig diagnosed Plaintiff as having moderate diverticulosis.

To be sure, Dr. Zelig also opines that most individuals who have colonic diverticula do not

even notice it, and that Plaintiff's moderate diverticulosis is not a serious condition that would render him unable to perform the specific functions of his job. But his is not the only medical opinion on the issue.

Ultimately, it will be for the jury to decide whether to believe Dr. Zelig or Ms. Stafford. Even more crucially, it will be for the jury to determine whether it believes Plaintiff's story that he left work on May 20, 2013 because he was truly ill, and not because he it was the busiest day of the year and the kitchen was already short staffed.

Finally, on the retaliation prong, Defendant argues that it is entitled to summary judgment because the first time Plaintiff raised an FMLA claim was in his Complaint and because, even if a lengthy email Plaintiff sent Defendant on May 30, 2013 constituted a request for leave, there could be no retaliation because Plaintiff was fired ten days earlier. This is correct sofar as it goes, but it ignores Plaintiff's position that he called Ms. Redmon when he found it necessary to leave work, and that he told her he had "something bad wrong with me," had blood in his stools, and was going to the hospital or health department. Just as there is a jury question on whether notice was properly given, there is a jury question on whether Defendant retaliated against Plaintiff by choosing to fire him without hearing his side of the story.

## III. Conclusion

On the basis of the foregoing, summary judgment will be entered in Defendant's favor on Plaintiff's ADA claim. The parties' cross-motions for summary judgment on his FMLA claims will be denied.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITE STATES DISTRICT JUDGE